# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

In the Matter of the Search of:

THE CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (920) 371-4279

)
)
)
)
)
)

Case No. _____19-MJ-1281_____

## APPLICATION FOR A SEARCH WARRANT

I, Todd Higgins, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

<u>See</u> Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

<u>See</u> Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 846 and 841(a)(1)

The application is based on these facts: <u>See</u> Affidavit in Support of Application for Search Warrant. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the requested warrant will also function as a pen register order. I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by HSI. *See* 18 U.S.C. §§ 3122(b), 3123(b).

☒ Delayed notice of _180_ days (give exact ending date if more than 30 days: _March 2, 2020_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Todd Higgins, Task Force Officer, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: __9/5/19_____

_____
*Judge's signature*

City and State: __Milwaukee, Wisconsin_____

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, DEA TFO Todd Higgins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (920) 371-4279 (i.e., the **TARGET TELEPHONE**), with the subscriber listed as PREPAID CUSTOMER, and whose service provider is Sprint, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251. The **TARGET TELEPHONE** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a deputized Federal Task Force Officer ("TFO"), with the United States Department of Justice, Drug Enforcement Administration, currently assigned to DEA Group 68, at the North Central High Intensity Drug Trafficking Area ("HIDTA"). As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and 21 U.S.C. § 878, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I was deputized as a TFO

with the DEA in 2018. In addition to being a TFO with the DEA, I have been a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigations ("DCI") since 2014. Prior to my employment for DCI, I was a Detective for the City of Brookfield Police Department and I have been in law enforcement for over 18 years.

4.      My responsibilities as a TFO include the investigation of violent crimes, criminal enterprises, violations relating to the illegal sale and transfer of narcotics and firearms, and violent criminal acts in furtherance of criminal enterprises. In addition, my duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. § 841, 843, and 846, and 18 U.S.C. § 1956. I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking. I have also participated in multiple investigations involving illegal drug trafficking by drug trafficking organizations. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their methods for concealing narcotics and narcotics proceeds, and their use of violence and threats of violence to protect their organization. I have received further specialized training concerning the interception of wire and electronic communications.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to

2

case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute and distribution of controlled substances) have been committed, are being committed, or will be committed by Jose Manuel GONZALEZ-COLLADO, Eric ROSA, Julio SEDA-MARTINEZ, Hector Yamil RODRIGUEZ, Marcos APONTE-LEBRON, FNU LNU (a/k/a "Omi"), and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## FACTS ESTABLISHING PROBABLE CAUSE
### Background on the Current Investigation

8. In September 2018, members of North Central High Intensity Drug Trafficking Area Group 63 and Group 68, along with members of Group 62, initiated an investigation into individuals distributing large quantities of cocaine throughout Milwaukee, Wisconsin. HIDTA identified the individuals involved in this cocaine distribution as, among others, Jose Manuel GONZALEZ-COLLADO, Hector Yamil RODRIGUEZ, Marcos APONTE-LEBRON, and Eric ROSA. The investigation revealed that GONZALEZ-COLLADO obtains kilogram-quantities of

3

cocaine from unknown source(s)-of-supply in Puerto Rico. ROSA would, among other things, broker cocaine deals for GONZALEZ-COLLADO in Milwaukee. APONTE-LEBRON would facilitate drug shipments from Puerto Rico, retrieve drugs from storage facilities for further distribution by local distributors in Milwaukee, collect drug proceeds, and facilitate the mailing of those proceeds to Puerto Rico. The investigation disclosed that ROSA would also broker heroin and fentanyl transactions in Milwaukee.

### Drugs and Suspected Drug Proceeds sent via U.S. Mail

9.      During the course of this investigation, the U.S. Postal Service intercepted cocaine-laden parcels originating from Puerto Rico and destined for residences in Milwaukee, Wisconsin on three distinct occasions. First, on September 28, 2018, the USPS intercepted and searched, pursuant to a warrant, a parcel containing approximately three kilograms of cocaine. The parcel originated from Hormigueros, Puerto Rico and was addressed to 1330 S. 22nd Street, Milwaukee, Wisconsin. On October 3, 2018, investigators observed a Honda Civic, registered to GONZALEZ-COLLADO, parked at the residence. On October 4, 2018, investigators executed an anticipatory warrant at 1330 S. 22nd Street, Milwaukee, Wisconsin once the cocaine-laden parcel was received at the residence. During the search, investigators discovered 353.46 grams of cocaine and firearms in the residence's garage. Parked in the alley adjacent to the garage, investigators observed a Toyota 4Runner, which was also registered to GONZALEZ-COLLADO.

10.     Second, on October 25, 2018, the USPS intercepted a suspicious parcel addressed to 2166 S. 15th Street, Milwaukee, Wisconsin and again originating from Hormigueros, Puerto Rico. Although officers attempted to deliver the parcel to the Milwaukee residence on October 29, 2018, no one retrieved it. A postal employee left a notice in the mailbox directing the

4

parcel's intended recipients to contact the USPS to claim the parcel. An unidentified male went to the Post Office to give the USPS his contact number in reference to the undelivered parcel. The phone number was affiliated with Jose BURGOS-RIVERA, an identified associate of GONZALEZ-COLLADO. U.S. Postal Inspector ("USPI") Tyler Fink called the number and spoke to a thick-accented male who agreed to retrieve the parcel. No one ever retrieved the parcel. On October 30, 2018, law enforcement searched the parcel pursuant to a warrant and discovered approximately two kilograms of cocaine.

11. Third, on April 8, 2019, the USPS intercepted a suspicious parcel addressed to 5152 S. 15th Street, Milwaukee, Wisconsin and originating from Mayagüez, Puerto Rico. The parcel was undeliverable because the destination address did not exist. On the same date, GONZALEZ-COLLADO went to the West Milwaukee Post Office to specifically inquire about the undelivered parcel. GONZALEZ-COLLADO gave the postal employee his name – Jose M. Collado – and telephone numbers as a means to contact him should the parcel arrive. Also on the same date, GONZALEZ-COLLADO left a message with the USPS to inquire about the parcel and left the telephone number (708) 982-6640 as his contact number. On April 15, 2019, law enforcement searched the parcel pursuant to a warrant and discovered approximately 1.8 kilograms of cocaine.

12. The investigation also determined that GONZALEZ-COLLADO had sent suspected drug proceeds to Puerto Rico. On February 19, 2019, location information lawfully-derived from (708) 982-6640 indicated the device was at a U.S. Post Office on the north side of Milwaukee. Video surveillance and still images from the postal facility showed GONZALEZ-COLLADO and an unknown male sending an overnight parcel to Puerto Rico. Suspecting GONZALEZ-COLLADO had mailed drug proceeds, the officers notified HSI and the U.S.

5

Postal Inspection Service in Puerto Rico. On February 22, 2019, location information for (708) 982-6640 indicated the device was again at the postal facility on the north side of Milwaukee. Video surveillance and still images showed GONZALEZ-COLLADO and Roberto SOSA (GONZALEZ-COLLADO's brother in-law) requesting a refund for the overnight parcel sent to Puerto Rico on February 19, 2019. Also on February 22, 2019, U.S. Postal inspectors in Puerto Rico obtained a warrant to search the contents of the suspect parcel. The parcel contained over $72,000 in U.S. currency.

13.     On May 23, 2019, USPI Fink reviewed U.S. Postal Service business records and identified a suspicious outbound parcel from Milwaukee, Wisconsin, destined for Mayagüez, Puerto Rico. The suspicious parcel was believed to contain drug proceeds. The parcel had a fictitious sender name and address (i.e. 1234 W. Walker Street, Milwaukee, Wisconsin 53204). Conspicuously, the address of Carlos FIGUEROA-REYES – a known associate of GONZALEZ-COLLADO – is 1233 W. Walker Street, Milwaukee, Wisconsin. USPI Fink noted the consignee address had been used before by other members of the organization on April 9, 2019, and April 20, 2019. On May 24, 2019, USPI Fink reviewed surveillance video at the West Milwaukee Post Office where the suspected money parcel was sent from. A review of surveillance video and still images showed Marcos APONTE-LEBRON enter the Post Office carrying the suspected money parcel and complete the transaction. APONTE-LEBRON paid $14.35 in cash to ship the suspected money parcel.

14.     According to U.S Postal records and video surveillance, between May 28, 2019 and July 18, 2019, Hector Yamil RODRIGUEZ appears to have shipped approximately eight parcels containing suspected drug proceeds to various locations in Puerto Rico and to two addresses in Mission, Texas. Likewise, between May 22, 2019 and August 1, 2019, APONTE-

6

LEBRON appears to have shipped approximately five parcels containing suspected drug proceeds to various locations in Puerto Rico and the same two addresses in Mission, Texas. Investigators have identified an Internet Protocol ("IP") address that has tracked several of the suspect parcels shipped to and from Puerto Rico and Mission, Texas. Based on information obtained via subpoena, the IP address tracking these parcels listed a subscriber address of 2730 S. 10th St., Milwaukee, Wisconsin 53215, which is the residence of RODRIGUEZ.

### Initial Controlled Purchases Involving GONZALEZ-COLLADO and ROSA

*December 6, 2018 Controlled Purchase*

15.     From December 2018 through June 2019, DEA TFO Michael Saddy (hereinafter the "UC"), who was acting in an undercover capacity, arranged controlled purchases of cocaine and heroin through ROSA in Milwaukee, Wisconsin. A confidential source introduced the UC to ROSA on December 6, 2018. During that time, ROSA facilitated the purchase of 3.5 grams of cocaine from an individual later identified as Wilberto SANTIAGO-MARTINEZ. While awaiting SANTIAGO-MARTINEZ, ROSA discussed his friend "Gordo" (later identified as GONZALEZ-COLLADO). ROSA said his cocaine was supplied by "Gordo," who received it from Puerto Rico. ROSA claimed he was once able to obtain between one-half and one kilogram of cocaine with little difficulty, but was unsure if he could still obtain that quantity of cocaine. ROSA said a kilogram of cocaine would cost approximately $22,000. ROSA reiterated that the cocaine would come from Puerto Rico.

*January 10, 2019 Controlled Purchase*

16.     On January 10, 2019, the UC originally arranged to purchase two ounces of cocaine from ROSA and SANTIAGO-MARTINEZ. While *en route* to the drug deal, ROSA said he was intending to cut SANTIAGO MARTINEZ out because "Gordo" (i.e., GONZALEZ-

7

COLLADO) was returning to the business. ROSA commented that GONZALEZ-COLLADO's cocaine was better quality and that GONZALEZ-COLLADO offered more timely service than SANTIAGO-MARTINEZ. ROSA said GONZALEZ-COLLADO normally gives ROSA the cocaine prior to a deal and that ROSA would be supplying the UC for subsequent deals. ROSA said the UC would be able to come into ROSA's residence where the UC could retrieve the cocaine. ROSA said GONZALEZ-COLLADO may even have ROSA deliver the cocaine directly to the UC because GONZALEZ-COLLADO liked to keep his customers happy.

17. Expressing frustration with SANTIAGO-MARTINEZ's delay, ROSA said he would take the UC to his other cocaine supplier – GONZALEZ-COLLADO. ROSA directed the UC to El Tsunami seafood restaurant, located at 2222 S. 13th Street Milwaukee, Wisconsin. ROSA said GONZALEZ-COLLADO was at the restaurant. ROSA gave the UC the choice as to whom the UC wished to conduct business: SANTIAGO-MARTINEZ or GONZALEZ-COLLADO. ROSA said GONZALEZ-COLLADO was better. ROSA said GONZALEZ-COLLADO agreed to immediately sell the UC two ounces, but that they needed to go to a home on 27th Street to pick it up. The UC agreed to purchase the cocaine from GONZALEZ-COLLADO.

18. ROSA walked inside the restaurant to confirm the new cocaine deal. Soon thereafter, GONZALEZ-COLLADO and ROSA exited the restaurant. GONZALEZ-COLLADO approached the passenger side of the UC's vehicle and greeted the UC. ROSA directed the UC to return to ROSA's residence. As the UC was driving ROSA to his residence, ROSA referred to GONZALEZ-COLLADO as "Jose," which is GONZALEZ-COLLADO's first name. ROSA remarked that GONZALEZ-COLLADO was expecting four kilograms of cocaine during the January 12th weekend. ROSA said GONZALEZ-COLLADO agreed to meet the UC at a BP gas

8

station located at 27th Street and Saint Paul Avenue. Soon after the UC and ROSA arrived at 27th Street and Saint Paul Avenue, GONZALEZ-COLLADO arrived in a silver Suzuki and parked directly behind the UC's vehicle. GONZALEZ-COLLADO approached the passenger side of the UC's vehicle and handed the UC a cup that held a clear plastic baggie containing a white powdery substance. The UC then gave $2,600 to ROSA as payment. GONZALEZ-COLLADO directed ROSA to hold onto the money. After the deal, ROSA exited the UC's vehicle and departed the scene with GONZALEZ-COLLADO. The UC thereafter drove to a pre-determined location where investigators conducted a field test on a random sample of the suspected cocaine, obtaining positive results.

*Additional Controlled Purchases involving ROSA and GONZALEZ-COLLADO*

19.     Since March 12, 2019, the UC conducted several controlled purchases of cocaine, heroin, and fentanyl (represented as heroin) from either ROSA or GONZALEZ-COLLADO in Milwaukee, Wisconsin. For instance, on March 12, 2019, the UC purchased an ounce of cocaine and 15 grams of heroin from ROSA in exchange for $2,650; on March 28, 2019, the UC purchased three ounces of cocaine and 15 grams of heroin from GONZALEZ-COLLADO for $5,100; on April 17, 2019, the UC purchased three ounces of cocaine and 20 grams of heroin from ROSA for $5,500; on May 8, 2019, the UC purchased two ounces of cocaine and an ounce of fentanyl (represented as heroin) from ROSA for $5,000; and on June 5, 2019, the UC purchased two ounces of cocaine, and two ounces of fentanyl (represented as heroin) from ROSA for $7,350. The substances purchased on each of these occasions subsequently field-tested positive for the controlled substances enumerated on each of those occasions. The UC arranged these transactions by communicating with ROSA via text and/or voice call, including the March 28, 2019 transaction involving GONZALEZ-COLLADO.

9

## Authorized interception of communications[1]

*GONZALEZ-COLLADO and RODRIGUEZ discuss Milwaukee-bound cocaine-laden parcels*

20.     On July 25, 2019, Assistant U.S. Attorney Robert J. Brady, Jr. applied for and successfully obtained authorization from U.S. District Judge J.P. Stadtmueller, Eastern District of Wisconsin, to intercept wire and electronic communications (Application Number 13029) for the cellular telephone assigned number (708) 982-6640 (hereinafter CELLULAR TELEPHONE-5) used by GONZALEZ-COLLADO.

21.     Based on several intercepted communications, GONZALEZ-COLLADO and Hector Yamil RODRIGUEZ discussed the receipt of several drug-laden packages from Puerto Rico via the U.S. Mail.  Specifically, on July 28, 2019, CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO) received a call from (414) 841-3770 (i.e., hereinafter CELLULAR TELEPHONE-6), used by RODRIGUEZ.  During the intercepted conversation, GONZALEZ-COLLADO said, "I think four will arrive tomorrow (i.e., July 29, 2019) and one on Tuesday (i.e., July 30, 2019) . . . . He (i.e., the drug source-of-supply) sent one to you for Tuesday; so, that means the other four will arrive tomorrow," indicating five drug-laden parcels were inbound for Milwaukee, Wisconsin.   At 8:30 p.m., CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO) received a call from (414) 208-5745 (i.e., hereinafter CELLULAR TELEPHONE-7), used by RODRIGUEZ.  During the intercepted call, RODRIGUEZ said, "Look, a picture of a box is missing," indicating he had not received the image of an inbound, drug-laden parcel.

---

[1] Most of the intercepted communications referenced in this Affidavit were originally conducted in Spanish.  These communications were translated into English by certified monitors who are fluent in both Spanish and English. Furthermore, the significance and meaning attributed to those intercepted communications are based on your Affiant's training, experience, and knowledge thus far derived from this investigation.

10

RODRIGUEZ continued, "[T]he photo from Añasco (i.e., a town in western Puerto Rico), dude. The box that was sent from Añasco. There is the one from Las Marías (i.e., a town in western Puerto Rico), the one from Hormigueros (i.e., a town in western Puerto Rico), the one from Cabo Rojo (i.e., a town in western Puerto Rico)," indicating he had received images of several, inbound drug-laden parcels (or images of mailing receipts for those parcels). GONZALEZ-COLLADO and RODRIGUEZ then engaged in the following colloquy regarding the parcels' various destinations in Milwaukee:

GONZALEZ-COLLADO (GC):   Listen to me, the first box is for Union.
RODRIGUEZ (R):   The first one is for Union, uh-huh.
GC:   The second one . . .
R:   The second one is for my girl's house.
GC:   The third one . . .
R:   The third one is for Holton that is at [unintelligible] . . .
GC:   Look, I sent (i.e., he sent an image of a parcel or mailing receipt) . . .
R:   The first one, that is for Union.
GC:   Look, the one for 84th is . . .
R:   That is the second one; that is the one from Cabo Rojo . . . . There are two receipts and one picture of a box is missing.
GC:   Listen to me, listen to me, the thing is that the first one was one that you sent me for an apartment number 3 . . .
R:   No, that one is for a house on 84th [unintelligible].
GC:   That was the first one I sent.
R:   Exactly, that is my girl's.
       . . .
GC:   Yeah, listen the one that say's 215 is for Bebe's (SEDA-MARTINEZ) house.
       . . .
R:   My girl's, Bebe's house, and Holton's, that is on the east side.
G:   The Union one; the 8th one, it's Yomo's mother-in-law's home; and the Holton one, that is the last one, the one I sent you with the box, the picture of the box.
R:   Yes, the one at Holton is my boss's father's house.
       . . . .

22.     Because GONZALEZ-COLLADO was in Philadelphia at the time, RODRIGUEZ kept him apprised regarding the status of the inbound, drug-laden parcels. For instance, on July 29, 2019, at 9:31 a.m., CELLULAR TELEPHONE-6 (i.e., RODRIGUEZ) received a call from

11

CELLULAR TELEPHONE-5. During the intercepted conversation, RODRIGUEZ said, "I checked (i.e., USPS tracking) on it at 8:00 this morning, the one that was closer to delivery was Holton's on the east side; but the other ones are at the Post Office ready for delivery. They will go out any moment for delivery." GONZALEZ-COLLADO inquired, "And the one's for Tuesday (i.e., July 30, 2019)?" RODRIGUEZ replied, "Yes, they are all set for today," meaning they were ready for delivery.

23. In a series of intercepted calls between CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO) and CELLULAR TELEPHONE-7 (i.e., RODRIGUEZ) on July 29, 2019, RODRIGUEZ informed GONZALEZ-COLLADO when parcels arrived at specific locations and when he retrieved them. For instance, during an intercepted conversation starting at 9:43 a.m., RODRIGUEZ said, "[T]he one from Bebe's (i.e., SEDA-MARTINEZ) house arrived." During an intercepted call starting at 10:15 a.m., RODRIGUEZ said, "The east-side one has arrived." USPS records disclosed a parcel from Hormigueros, Puerto Rico mailed to "Jose L. Rivera" at 2778 N. Holton St., Milwaukee, a residence on the east side of Milwaukee. During an intercepted call starting at 4:08 p.m., RODRIGUEZ said, "I'm waiting because I have to go get the box that is at my girl's house." Later during the same call, RODRIGUEZ said, "I got the box from Union as well" and "We are missing the one from Yomo's and the one at my girl's; but, I'll go pick it up later." During an intercepting call starting at 4:39 p.m., RODRIGUEZ remarked on their success by stating, "Damn, five boxes in one day." GONZALEZ-COLLADO replied, "We are hard core."

24. On July 29, 2019, USPI Fink reviewed USPS records and identified five parcels sent from Puerto Rico to different addresses in Milwaukee, Wisconsin. In particular, USPI Fink identified a parcel with a handwritten label addressed to "Julio Martinez" at 1613 S. Union

12

Street, Milwaukee, Wisconsin. The parcel was sent from Hormigueros, Puerto Rico and weighed approximately two kilograms. On July 29, 2019, at approximately 2:50 p.m., the USPS delivered the parcel to 1613 S. Union Street, Milwaukee, Wisconsin. Record queries indicate SEDA-MARTINEZ is affiliated with this address. On the same date, at approximately 9:30 a.m., the USPS delivered a suspicious parcel addressed to 2428 S. 9th Street, Milwaukee, Wisconsin. This suspicious parcel was addressed to "Julio E. Seda" and was sent from Añasco, Puerto Rico. The parcel weighed approximately three kilograms. In addition to the above-referenced recorded mailings from Puerto Rico, parcels arrived at 3255 S. 84th St., Apt. 3, Milwaukee, Wisconsin, and 1968 S. 8th St. Lower, Milwaukee, Wisconsin. Investigators elected not to seize these parcels in order to avoid arousing suspicion among the investigative targets that law enforcement was actively scrutinizing their conduct, and thus risking an abrupt change in their behavior to throw off such suspected law-enforcement scrutiny.

25. During an intercepted call, RODRIGUEZ and GONZALEZ-COLLADO discussed the allocation of the drugs contained in the parcels that arrived in Milwaukee. Specifically, on July 29, 2019, at 7:45 p.m., CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO) received a call from CELLULAR TELEPHONE-7 (i.e., RODRIGUEZ). During the intercepted conversation, RODRIGUEZ said, "[T]he half tablet (i.e., one-half kilogram) for Jose Manuel is there. So, 250 grams for Yadiel." RODRIGUEZ then inquired, "Is there another half tablet in another of those boxes that are not open?" GONZALEZ-COLLADO replied, "I do not know. They need to be checked." RODRIGUEZ commented, "I sold 250 to Migue as well. I wanted to know if there is a half tablet by itself because I got 250 for Yadiel and 250 for Migue; so, I do not have to break that half tablet . . . ." Later in the conversation, RODRIGUEZ noted that a parcel retrieved from West Allis, Wisconsin probably contained two kilograms of

13

drugs by saying, "I think there are two in here, in the one that arrived at West Allis." Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes these parcels contained cocaine.

*GONZALEZ-COLLADO and RODRIGUEZ discuss mailing drug proceeds*

26.     On July 30, 2019, in a series of intercepted communications, GONZALEZ-COLLADO and RODRIGUEZ discuss preparing drug proceeds to be boxed and mailed to the source(s)-of-supply. Specifically, on July 30, 2019, at 4:13 p.m., CELLULAR TELEPHONE-7 (i.e., RODRIGUEZ) called CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO). During the intercepted conversation, RODRIGUEZ inquired as to how much money he should put in a box by asking, "How much do I make for one?" GONZALEZ-COLLADO asked, "How much do you have?" RODRIGUEZ replied, "Man, there is a lot. All that cannot be put in one." GONZALEZ-COLLADO inquired if RODRIGUEZ had a money-counting machine by asking, "And you don't have that to count the money, right?" RODRIGUEZ replied, "I am going to get the machine later." RODRIGUEZ then inquired if he should place $29,500 in a single box by asking, "Look, put together a box of how much, 29 and a half?" GONZALEZ-COLLADO responded that he wanted RODRIGUEZ to place the drug proceeds collected by their associates ROSA and Kevin TORRES-BONILLA in a box. Specifically, GONZALEZ-COLLADO said, "Look, for Erico (i.e., ROSA) there is 15,450," meaning GONZALEZ-COLLADO wanted RODRIGUEZ to box $15,450 of drug proceeds collected from ROSA. RODRIGUEZ asked, "For Kevin (i.e., TORRES-BONILLA) there is 15,550, right?" GONZALEZ-COLLADO replied, "Yes," meaning that he wanted RODRIGUEZ to include $15,550 of drug proceeds collected from TORRES-BONILLA. Sounding exasperated, RODRIGUEZ subsequently

14

commented, "Give me a moment, this fucker brought me a bunch of money without being wrapped."

27.     At 4:50 p.m., CELLULAR TELEPHONE-6 (i.e., RODRIGUEZ) called CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO).     During the intercepted conversation, RODRIGUEZ said, "I have 15 and 15, that's 30; that's 30, and 500 that I have right here . . . 400," indicating that RODRIGUEZ would have over $30,000 in drug proceeds to be boxed and mailed. GONZALEZ-COLLADO subsequently directed, "Put 32 in it," meaning that he wanted RODRIGUEZ to box $32,000 in drug proceeds. RODRIGUEZ replied, "I'm putting in everything that is here."

28.     At 5:20 p.m., CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO) received a call from (414) 312-3631, used by Kevin TORRES-BONILLA. During the intercepted conversation, TORRES-BONILLA said, "I am taking him the money and I am going to take another whole one right now," meaning that TORRES-BONILLA was delivering drug proceeds to RODRIGUEZ and wanted additional drugs for distribution. Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes "a whole one" refers to a kilogram of cocaine. TORRES-BONILLA reiterated, "I am taking the money with me; I have 15,500, 15-50 and I think I am going to take another one," meaning he had $15,500 in drug proceeds to deliver to RODRIGUEZ and desired more cocaine for distribution.

29.     At 5:36 p.m., CELLULAR TELEPHONE-6 (i.e., RODRIGUEZ) called CELLULAR TELEPHONE-5 (i.e., GONZALEZ-COLLADO).     During the intercepted conversation, GONZALEZ-COLLADO inquired if RODRIGUEZ had mailed the box containing

15

drug proceeds by asking, "Did you send it?" RODRIGUEZ replied, "Yes, and I sent you the receipt too," indicating he had mailed the box and provided GONZALEZ-COLLADO the proof.

*RODRIGUEZ and "Omi" discuss Milwaukee-bound cocaine-laden parcels and mailing drug proceeds*

30. On August 27, 2019, Assistant U.S. Attorney Robert J. Brady, Jr. applied for and successfully obtained authorization from U.S. District Judge J.P. Stadtmueller, Eastern District of Wisconsin, to intercept wire and electronic communications (Application Number 13029) for the cellular telephone assigned number (414) 208-5745 (i.e., CELLULAR TELEPHONE-7) used by RODRIGUEZ.

31. On August 27, 2019, at 8:43 p.m., CELLULAR TELEPHONE-7 (i.e., RODRIGUEZ) received a call from (920) 371-4279 (i.e., the **TARGET TELEPHONE**), used by First Name Unknown (FNU) Last Name Unknown (LNU) (a/k/a "Omi"). During the intercepted call, RODRIGUEZ identified the user of the **TARGET TELEPHONE** as "Omi." "Omi" said, "[T]his week I didn't send you, but . . . I have the box done already," indicating that "Omi" had a parcel ready to be sent to RODRIGUEZ. RODRIGUEZ inquired, "[W]hen will that storm be going through, Omi?" – referencing Hurricane Dorian, which was then forecast to impact Puerto Rico, and thus disclosing "Omi's" likely location. "Omi" replied, "Wednesday or Thursday (i.e., August 28 or 29, 2019)," which were the dates that Hurricane Dorian was originally forecast to hit Puerto Rico. "Omi" then admonished RODRIGUEZ not to mail anything to Puerto Rico until the hurricane passed by saying, ""[D]on't send anything, until it goes through," and further commented, "if the hurricane ruins us, we would have to wait." RODRIGUEZ indicated that parcels originating from Puerto Rico may get scrutinized if mailed during the midst of the storm by saying, "Then they'll be like, 'Oh, let's check these boxes that

16

are stuck here.'" "Omi" then said, "Send me another [unintelligible] and on Monday I will send you two (2)." Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes "Omi" wanted RODRIGUEZ to send him a parcel containing drug proceeds, and "Omi" would mail two kilograms of cocaine to RODRIGUEZ the following Monday.

32.     On August 30, 2019, at 9:09 a.m, CELLULAR TELEPHONE-7 (i.e., RODRIGUEZ) called the **TARGET TELEPHONE** (i.e., "Omi"). During the intercepted call, "Omi" said, "Send me the other address so I can get up tomorrow and send you two (2)," indicating he wanted RODRIGUEZ to provide an address where he could mail two kilograms of cocaine. "Omi" continued, ""I was waiting to do it on Saturday, because I thought [the hurricane] was coming." RODRIGUEZ replied, "That's not going to happen, go drop it off," indicating he did not want "Omi" to further delay mailing the drug-laden parcel. RODRIGUEZ then said, "I almost have yours, it's like 24 right now," and continued, "I am going to sit down and count now." Based on my training and experience, and the information thus far obtained in this investigation, your Affiant believes RODRIGUEZ indicated that he so far had approximately $24,000 of the drug proceeds ultimately to be sent to "Omi."

33.     Given that FNU LNU (a/k/a "Omi"), like most contemporary cellular telephone users, likely possesses, or has in close proximity, the **TARGET TELEPHONE** nearly everywhere he goes, location information for the **TARGET TELEPHONE**, such as E-911 Phase II data, GPS data, and latitude-longitude data, will assist law enforcement in more precisely ascertaining his movements. By more precisely ascertaining "Omi's" movements, law enforcement officers will be better able to divine patterns from those movements, ascertain periods of heightened activity, and thereby more effectively conduct physical surveillance. As a

17

result, law enforcement officers will be better able to, among other things, discern "Omi's" drug distribution routes, identify confederates involved in the distribution of controlled substances, and identify locations where those controlled substances, and proceeds from the sale of those controlled substances, may be concealed.

34. Law enforcement subpoenaed the subscriber information for the **TARGET TELEPHONE** which revealed the following information:

- Subscriber: PREPAID CUSTOMER
- Date range: 06/29/2019 to 08/27/2019
- Account Established Date: 06/06/2019
- Account Type: Sprint Account

35. In my training and experience, I have learned that Sprint is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

18

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

36.     Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the **TARGET TELEPHONE**, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available.

37.     Based on my training and experience, I know that Sprint can collect cell-site data on a prospective basis about the **TARGET TELEPHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

38.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the **TARGET**

19

**TELEPHONE**, without geographic limit, for a period of forty-five days (45) days pursuant to 18 U.S.C. § 3123(c)(1).

39.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

40.     I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint.  I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably

available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

41.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE** outside of daytime hours.

42.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

# ATTACHMENT A

## Property to Be Searched

1.    The cellular telephone assigned call number (920) 371-4279 (i.e., the **TARGET TELEPHONE**), with listed subscriber PREPAID CUSTOMER, and whose wireless communications service provider is Sprint, headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251.

2.    Records and information associated with the **TARGET TELEPHONE** that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**Particular Things to be Seized**

## I. Information to be Disclosed by the Provider

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

2

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute a controlled substance and distribution of a controlled substance) involving Jose Manuel GONZALEZ-COLLADO, Eric ROSA, Julio SEDA-MARTINEZ, Hector Yamil Rodriguez, Marcos APONTE-LEBRON, FNU LNU (a/k/a "Omi"), and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Case 2:19-mj-01281-WED   Filed 03/16/20   Page 25 of 28   Document 1

## ATTACHMENT A

### Property to Be Searched

1.    The cellular telephone assigned call number (920) 371-4279 (i.e., the **TARGET TELEPHONE**), with listed subscriber PREPAID CUSTOMER, and whose wireless communications service provider is Sprint, headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251.

2.    Records and information associated with the **TARGET TELEPHONE** that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy to distribute a controlled substance and distribution of a controlled substance) involving Jose Manuel GONZALEZ-COLLADO, Eric ROSA, Julio SEDA-MARTINEZ, Hector Yamil Rodriguez, Marcos APONTE-LEBRON, FNU LNU (a/k/a "Omi"), and others.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.